**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**CHALONDA MOSLEY, Individually and as
Personal Representative on Behalf of the
Wrongful Death Beneficiaries of JUSTIN MOSLEY**                    **PLAINTIFF**

**V.**                                **CIVIL ACTION NO. <u>3:23-cv-135-CWR-FKB</u>**

**HINDS COUNTY, MISSISSIPPI, QCHC INC.,
QCHC OF MISSISSIPPI, LLC, BRITTANY PIPPINS,
DEBRA BELL, PAMELA MARTIN, and JOHN AND
JANE DOES 1 – 100**                              **DEFENDANTS**

<u>**PLAINTIFF'S FIRST AMENDED COMPLAINT**</u>

***Jury Trial Demanded***

1.      This Complaint is brought by Chalonda Mosley (hereinafter, "Plaintiff"), Individually and as Personal Representative on behalf of the wrongful death beneficiaries of Justin Mosley, (hereinafter, "Decedent"), by and through undersigned counsel, against Hinds County, Mississippi, QCHC Inc., QCHC of Mississippi, LLC, Brittany Pippins, Debra Bell, Pamela Martin, and John and Jane Does 1-100, (hereinafter, "Defendants".)

<u>**JURISDICTION AND VENUE**</u>

2.      Subject Matter Jurisdiction is appropriate in federal court since a federal question is raised pursuant to 42 U.S.C. § 1983 as well as the 8th and 14th Amendments to the United States Constitution. The jurisdiction of this Court is also invoked pursuant to 28 U.S.C. § 1331 and 1343. The Court also has pendent jurisdiction over the Plaintiff's State causes of action.

3.      Venue is appropriate in this Court under § 1391(b) as all acts and/or omissions occurred in Hinds County, Mississippi, which is located within the Southern District of the United States District Court, Northern Division.

## **PARTIES**

4.    Plaintiff, Chalonda Mosley, is an adult resident citizen of Hinds County, Mississippi. Her current residence is 1041 O Neil Drive, Edwards, Mississippi 39066, Hinds County, Mississippi. Plaintiff, the natural mother of the Decedent, brings this action individually and on behalf of the surviving heirs/wrongful death beneficiaries of Decedent.[1]

5.    Decedent was, at all times material to this Complaint, an adult incarcerated at the Hinds County Detention Center (hereinafter, "HCDC"). Substantial acts, omissions, and events that caused the Decedent's death took place in Hinds County, Mississippi. At the time of the incident which gives rise to this Complaint, Decedent was a 21-year-old citizen of the State of Mississippi and a pre-trial detainee incarcerated at HCDC. Plaintiff, as Personal Representative, brings this action pursuant to Mississippi Code Ann. § 11-7-13 (1972), the Wrongful Death Statute.

6.    Defendant, Hinds County, Mississippi, is located within the Southern District of the United States District Court, Northern Division. Hinds County, by and through the Office of the Hinds County Sheriff's Department, manages and operates the HCDC. Hinds County has the responsibility for providing humane care and treatment consistent with all constitutional and American Correctional Association standards. Defendant is subject to the in personam jurisdiction of this Court by service of process upon its Board of Supervisors, by and through the Hinds County Chancery Court Clerk, Eddie Jean Carr, who also serves as the Clerk of the Hinds County Board of Supervisors, located at the Hinds County Chancery Courthouse, 316 South President Street, Jackson, Hinds County, Mississippi 39201. Hinds County officials and policymakers knew that the HCDC was understaffed with untrained officers as early as August 2013 when Dr. James

---

[1] An heirship determination is pending. Plaintiff will amend this Complaint to allege the true names and addresses of the surviving heirs and wrongful death beneficiaries of the Decedent at a later time.

Austin conducted his inspection of the jail.  Throughout the following years, numerous teams of independent experts have continued to note the jail is not adequately staffed, that the jailers are not properly trained, and that the inmates do not have adequate access to medical and mental health care.

7.      Lee Vance was the Sheriff of Hinds County, Mississippi at the time of the Decedent's death. Sheriff Vance passed away in August 2021. Sheriff Vance was responsible for the administration of the HCDC, and had the duty to hire, supervise, train and discipline the staff at the facility, as well as ensuring the facility's compliance with ACA standards and the laws and Constitutions of Mississippi and the United States. His duties also included reviewing, investigating, and responding to prisoner grievances and complaints, and as an employee of the Defendant, he was considered as a final policymaker for the Hinds County Detention Center at the time of the incident described in this Complaint.

8.      Defendant, QCHC Inc. and QCHC of Mississippi, LLC, (hereinafter, "QCHC"), a for-profit private medical company incorporated and existing in the state of Alabama, is under contract with Hinds County, Mississippi, to provide the inmates housed with the HCDC with on-site medical care. Under its contract with Hinds County, QCHC has the responsibility for providing humane care and treatment consistent with all constitutional and ACA standards. QCHC's principal place of business is located at 200 Narrows Parkway, Suite A, Birmingham, Alabama 35242, and is subject to in personam jurisdiction of this Court by service of process upon its registered agent, Incorp Services, Inc., at 302 Enterprise Drive, Suite A, Oxford, Mississippi 38655.

9.      President Manuel was a correctional officer at the Hinds County Detention Center. President Manuel was removed as a Defendant, as it has come to the Plaintiff's attention that

President Manuel is deceased.

10.    Defendant, Brittany Pippins, was a Licensed Master Social Worker employed by QCHC at the Hinds County Detention Center. Defendant Pippins may be served with process and her place of employment, or her residence located at 1608 Twin Oaks Drive, Clinton, Mississippi 39056.

11.    Defendant, Debra Bell, was a specialized Nurse Practitioner employed by QCHC at the Hinds County Detention Center. Defendant Bell may be served with process at her place of employment at the Hinds County Detention Center, located at 1450 County Farm Road, Raymond, Mississippi 39154, or her residence, located at 133 Linda Drive, Canton, Mississippi 39046-3150.

12.    Defendant, Pamela Martin, was an employee with Quality Correctional Health Care at the Hinds County Detention Center. Defendant Martin may be served with process at her place of employment at the Hinds County Detention Center, located at 1450 County Farm Road, Raymond, Mississippi 39154, or her residence.

13.    Plaintiff is ignorant as to the identities of Defendant John and Jane Does 1-100 who are unknown officers, employees, agents, and or servants of the Hinds County Sheriff's Department and/or QCHC.  Plaintiff will amend this Complaint to allege their true names and allege that each of the fictitiously named Doe Defendants are responsible in some manner for the occurrences herein alleged, and that Decedent's damages, as alleged herein, were proximately caused by their conduct.  Plaintiff, upon information and belief, asserts that the Doe Defendants were the officers, agents, servants, and employees of the Defendant Hinds County and QCHC herein, and were at all times acting under color of law with the permission and consent of Defendant within the course and scope of their employment.

## FACTS

14.     On or about, January 29, 2020, the Decedent was arrested and held at the Hinds County Detention Center. The Decedent had a long history of serious mental illness and the employees at the HCDC and QCHC were familiar with him.[2] His mother, the Plaintiff, contacted Hinds County officials at the jail to inform them of his condition and the fact that he needed mental health treatment. The Plaintiff faxed a copy of the Decedent's mental health diagnosis on February 21, 2020; April 24, 2020; May 25, 2020; May 26, 2020; June 25, 2020; and July 27, 2020, to the Jail Administrator, Nurse Sims RN, and Warden Rick Felder. In addition, the Plaintiff personally spoke with Warden Rick Felder, Nurse Sims RN, Sergeant Winters, Officer Hudson, and Assistant Warden Travis Crain.

15.     Throughout his stay at the jail, the Decedent experienced numerous mental health episodes. Specifically, in February 2021, the Decedent expressed desire to harm himself and was placed on suicide watch. In addition, the Decedent was beaten by jail personnel for "acting up". On February 17, 2021, Plaintiff spoke with Assistant Warden Crain regarding Crain handcuffing and beating the Decedent. The poorly trained jail staff was not trained to recognize the Decedent's "acting up" was actually a mental health episode and he needed outside treatment.

16.     Hinds County had a policy of failing to provide mental health training to staff as well as a policy of failing to provide mental health treatment to detainees. For example, in the Court Appointed Monitor's 14th Monitoring Report, filed on July 27, 2021, (hereinafter "Monitoring Report"), which is attached as Exhibit "A", Court-Appointed Monitor Elizabeth Simpson wrote, "mental health staff is responsible for *advocating for the mentally ill detainees in*

---

[2] The Decedent was diagnosed with early onset bipolar disorder with psychotic features.

*segregation*."[3] "Mental health staff reported that their visits to detainees must often be cancelled and rescheduled due to a shortage of security staff ." "Due to shortage of security staff, detainees are often not brought to medical for scheduled visits. . . Despite the fact that security staff are notified a day in advance of scheduled visits."[4]

17.    On Monday April 12, 2021, Assistant Warden Travis Crain instructed Lieutenant Cheryl George to place the Decedent into booking. On the Detainee Transfer Form, the reason for the Decedent's move was "Disciplinary."

18.    On April 12, 2021, Officer Hudson told Plaintiff that Decedent was banging on the door and yelling. Plaintiff advised Officer Hudson that Decedent was manic. Plaintiff asked to speak with Decedent or let Decedent have a shower, to which Officer Hudson responded that would have to wait until Assistant Warden Crain returned on Monday April 19, 2021.

19.    On April 13, 2021, the Decedent was scheduled a Mental Health Therapist appointment due to "aggressive behavior." The April 13 appointment was rescheduled by Pamela Martin to April 16, 2021, with a note stating, "aggressive behavior today." The appointment description stated, "staff stated this individual is aggressive and refused to bring this individual out of his cell." Brittany Pippins changed the appointment with a note stating, "no security officer available." Staff shortages at the HCDC routinely interfered with inmates' mental health appointments.

20.    On April 18, 2021, the Decedent was found hanging unresponsive in a booking holding cell where he had been housed for several days. The following facts are taken from the Court Appointed Monitor's Interim Report filed on October 28, 2021, which is attached as Exhibit "B". When an officer was called to help process two new arrestees, he saw the Decedent hanging

---

[3] P. 40.
[4] P. 34

from a light fixture in holding cell 1124 (the one closest to the sallyport). The officer had not been issued a set of keys, so he had to obtain them from officers in the Booking office in order to enter the Decedent's cell. The Detention Officer assigned to work the Booking floor (holding cell area) was not at his designated post. Booking officers often congregate in the office instead of being on the floor where 15 minute well-being checks must be conducted on all inmates located in the holding cells. Apparently, there was no Sergeant working in Booking at the time. The responding officers did not have a 911 knife; instead, they had to use a pair of scissors to cut the sheet from around the inmate's neck. Nurses responded from Medical to obtain an AED. This was the same problem that occurred just a month before.[5] Obviously, no corrective action was taken. As in the first case, an After-Action Report has yet to be completed.

21.     Officer President Manuel was responsible for observing the Decedent every fifteen (15) minutes and for keeping an observation log of the Decedent's behavior. Officer Manuel blatantly ignored or was deliberately indifferent to the Decedent's successful suicide attempt. Video from the Booking cell shows, in plain view, the Decedent tying a bedsheet to a light fixture at 12:25. The Decedent, in plain view, tied the bedsheet around his neck at 12:28. The Decedent, in plain view, hung lifeless from the bedsheet until the video cut off at 2:44. Had Officer Manuel performed his/her duty to observe the Decedent every fifteen minutes, the Decedent would still be alive.

22.     Officer Manual willfully failed to abide by his/her responsibility to observe the Decedent every fifteen (15) minutes and keep an observation log of the Decedent's behavior.

---

[5] On March 19, 2021, an arrestee was in Booking to be processed. A nurse was called, and she determined the arrestee needed to be transported to the hospital due to his condition. Later, the arrestee collapsed, and the nurse was called to perform CPR. The nurse attempted to provide oxygen from an O2 concentrator, but needed an extension cord to reach another outlet because the nearest outlet was faulty. There was no AED unit in Booking, so someone ran to Medical to obtain one. When an AED was finally provided, it had no pads. The arrestee died. Neither an incident report nor an After Action report was completed.

Officer Manuel falsified the observation log from 12:00PM – 2:15PM on April 18, 2021. Officer Manuel wrote in the observation log that the Decedent was "standing at the door" and was "quiet" between 12:00PM – 2:15PM; however, the Decedent was hanging from a self-made noose during these times. Had Officer Manuel performed his/her duties, the Decedent would still be alive. Officer Manuel willfully disregarded the safety of the Decedent by failing to make routine observations every fifteen minutes, as well as falsifying the observation log of the Decedent's behavior.

23.     Hinds County officials, including the Board of Supervisors and the policy makers, have long been aware of the dangerous, violent and poor conditions at the HCDC.  Representatives from the Hinds County Sheriff's Department have regularly advised the Hinds County Board of Supervisors ("Board") about the problems at the jail and have requested that the problems be addressed.  The Hinds County Circuit Court entered an Order on July 23, 2013, mandating that the Hinds County Grand Jury perform an intensive and in-depth evaluation of the conditions of the Detention Center, and make its recommendations to the Court as to its findings.

24.     On September 17, 2013, the Report of the Hinds County Grand Jury was filed with the Circuit Clerk of the First Judicial District of Hinds County, wherein it determined that "the Hinds County Detention Center (HCDC) is in deplorable condition and inadequately staffed.  In its present state, the HCDC poses major security risks to inmates, staff of the facility, visitors to the facility, and to the citizens of Hinds County.  The facility also poses a major liability risk to Hinds County."  The Report adopted the Assessment Report generated by Dr. James Austin, Ph. D; his sixteen (16) page Report prepared at the request of the Grand Jury documented numerous egregious and emergent issues in existence at the Detention Center warranting immediate correction.  *See* Report of Hinds County Grand Jury attached hereto and incorporated herein by

reference as Exhibit "C".  Despite the Grand Jury Order, compliance by Hinds County officials was minimal, at best.

25.    In response to an egregious number of serious incidents at the HCDC (many of which having taken place after the Grand Jury's Report) that resulted in serious physical harm (including death) to both staff and inmates and the denial of inmates' constitutional rights, the United States Department of Justice's Civil Rights Division ("DOJ") instituted an in-depth investigation into the facility and its conditions.  On May 21, 2015, the DOJ released its findings, pursuant to the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997.  The twenty-nine (29) page Report (hereinafter, "DOJ Report") concluded that the HCDC was in violation of the Eighth and Fourteenth Amendments of the United States Constitution, outlining therein a pattern and practice of Constitutional violations and mandating the immediate implementation of very specific remedial measures.  *See* DOJ Report attached hereto and incorporated herein by reference as Exhibit "D".

26.    As a result of the DOJ report, Hinds County entered into a Consent Decree on June 23, 2016, a copy of which is attached as Exhibit "E". Hinds County agreed to, *inter alia,* develop policies and procedures to protect inmates from harm, hire sufficient numbers of jailers and provide training and supervision over these jailers to ensure that inmates are protected from harm. The court appointed a group of experts and assigned them to make periodic visits to the jail to ensure Hinds County was complying with the consent decree.

27.    During the course of monitoring the consent decree, the court held numerous hearings, both in person and telephonically. Hinds County officials were present for several of these hearings. During the hearings, one of the court appointed experts would present summary testimony concerning the most recent onsite visits. As a result of attending the hearings, Hinds

County and officials had first-hand knowledge prior to the Decedent's death, about the unconstitutional conditions of confinement at the HCDC.

28.    In 2021, conditions remained poor at HCDC, if not worse. The previously mentioned Court Appointed Monitoring Report filed on July 27, 2021, which is attached as Exhibit "A", shows that the already low staffing numbers continued. The jail did not have enough staff to provide medical or mental health services. Mental health visits to detainees were often cancelled or rescheduled due to a shortage of security staff. The mental health caseload continued to increase, with about 177 detainees on the caseload (an increase of 45% over the last two monitoring periods).[6] The acuity of the population had also increased, meaning there was a "larger percentage of detainees on the caseload suffering from acute, extremely serious mental illness." "Since additional mental health staff were not included in the recently signed contract with QCHC, the size of the mental health staff has remained the same. There are still only 2.5 QMHPs (Qualified Mental Health Professionals) and a part time Psychiatric NP/prescriber; they are responsible for all mental health assessments, development of treatment plans, the provision of treatment (individual and group therapy and medication management), the management of mental health emergencies (such as suicidal detainees), and the documentation of what they are doing in each detainee's medical records.

29.    The performance of an interdisciplinary mortality review in instances where there has been a successful suicide is an area of concern, according to the Monitoring Report.[7] "A completed suicide warrants a full, interdisciplinary mortality review." At the time of writing the 14th Monitoring Report, a medical/mental health mortality review for the Decedent had not been

---

[6] P. 40.
[7] P. 44

completed and provided to the Monitoring Team.[8] "At present, there is no indication of an intent to perform such an interdisciplinary review, which is disconcerting, and as a result, it is extremely unlikely that there will be the type of collaborative, integrated, interdisciplinary corrective action plan that could decrease the risk of suicide within the facility."[9] "Separate from the mental health concerns, with respect to security operations, the inmate was inappropriately housed in Booking and the required frequency of well-being checks was not met."[10]

30.    After six troubling deaths at the HCDC in 2021, and a series of concerning Monitoring Reports, on November 23, 2021, District Judge Carlton Reeves filed a Show Cause Order against Hinds County to show why it should not be held in contempt. A hearing on the motion was scheduled for February 14, 2022.

31.    On February 16, 2022, during an Evidentiary Hearing before District Judge Reeves, Ms. Kathryn Bryan, former Hinds County Jail Administrator described the minimal training that detention staff received. Bryan wanted to have specially trained staff on the unit. "A nationally recognized trainer in that arena offers an extraordinary high-quality training product for detention officers. She had three offerings for training for detention staff; we got through one of those. There was delay and difficulty with her being paid for that training. We could not schedule the second one until she was paid on the first one. The day before the second one, several of my officers were fired—some of those were supposed to be in that class. That left me unable to fill that class because I did not have enough staff to backfill the students going to that training."[11]

32.    Ms. Bryan testified that "as policies were approved and implemented, the training officer would read the policies to all staff, and staff would sign the acknowledgement that they had

---

[8] P. 44
[9] P. 44
[10] P. 44
[11] Tr. 417.

read and understood the policies. *I did not believe this was adequate training*. I requested that detention training fall under my authority so that I could create a training program. I put in requests for training for line officers, for supervisors, and for the command staff team. I got several responses that there was not enough money for the training. I put in a requisition for detention field training officer course and detention field training officer supervisor. In my experience, often detention training is nothing more than a law enforcement training platform where they scratch out the word 'law enforcement officer' and add the word 'detention officer.' *That is not quality detention training* . . . There is such a program for detention field officer and detention field officer supervisor, so I put in a requisition for that, and it was denied."[12]

33.     The HCDC employees were not only poorly trained, but they were also understaffed. Ms. Bryan testified that "security staff levels affect the delivery of medical services at HCDC. Medical staff go to housing units to deliver medications and conduct mental health wellness checks on inmates. They see inmates in the clinic. Anytime a medical provider is in contact with an inmate, we need security staff with them to make sure they are safe. When staffing is low, security staff are not available, so medical staff has difficulty tending to all the needs. This impacts detainees' access to medical and mental health care."[13]

34.     Ms. Bryan testified that 3 detainees died while she was jail administrator.[14]

35.     On February 16 and 17, 2022, during an Evidentiary Hearing before District Judge Reeves, Dr. Richard Dudley, Corrections Mental Health, reiterated Ms. Bryan's testimony regarding inadequate training, understaffing issues, and the lack of medical and mental health treatment.

---

[12] Tr. 416-17.
[13] Tr. 502.
[14] Tr. 518-19.

36.     Dr. Dudley testified that QCHC's role at HCDC is as a "contract provider of medical and mental health services. They provide all medical and mental health staff at the facility. They have the responsibility for interacting with administration staff at the facility and corrections officers in any way outlined in their policies and procedures."[15] Medical staff has a responsibility for monitoring individuals who are in special circumstances.[16] The medical and mental health staff are responsible for the management of suicidal detainees and monitoring those on suicide watch.[17] "Individuals who are being held in isolation or segregation, they [medical staff] have a responsibility for regularly checking and monitoring them as well."[18] The mental health staff aims to see people on the mental health caseload monthly but are unable to do so because there were two (2) qualified mental health professionals, and a little over two hundred (200) people on the mental health caseload.[19]

37.     Dr. Dudley recommended that Hinds County hire more mental health staff in late 2018 or early 2019. As of 2021, Hinds County's mental health caseload grew, but mental health staff did not. Having adequate correctional staff to support the medical and mental health providers is not a new issue. "It has been a problem as long as I've [Dr. Dudley] been there, which was 2018."[20]

38.     In the evenings and on weekends, there were often no security staff available in the medical unit.[21] When no security staff are available in the medical unit, this affects detainees' access to care.[22]

---

[15] Tr. 538-39.
[16] Tr. 547.
[17] Tr. 548.
[18] Tr. 547.
[19] Tr. 557-58.
[20] Tr. 577.
[21] Tr. 599.
[22] Tr. 600.

39.    Dr. Dudley's testimony revealed that "mental health staff does not have a role in disciplinary decisions for people on the mental health caseload, which is required under the consent decree. In evaluating compliance under consent decree paragraph 42(g), this included evaluating the defendants' progress on building a mental health unit."[23]

40.    The lack of adequate correctional staffing created a substantial risk of serious harm to detainees. Leaving those with serious medical and mental health difficulties untreated causes pain and suffering for those individuals, and those with serious mental health cases are at risk of other confrontations and behavioral difficulties while detained.[24]

41.    People with serious mental illness come to be in segregation in two scenarios. One is the behavior is such that cannot be managed on the general population unit, or they are perceived as vulnerable to victimization in the general population. Effective policy has not been developed and formalized with respect to someone with serious mental illness doing something that gives rise to disciplinary charge. Mental health staff is not consulted before someone who is on the mental health caseload is put in segregation.[25] This consultation is important: one, to be clear that in a disciplinary review the person is able, competent to represent themselves in such a setting; two, whether the behavior for which they have been charged is a product of their mental illness or not; third, are there medical or mental health implications related to the various actions that could be taken following disciplinary review. Dr. Dudley stated, "in other words—is placement in segregation something that can be particularly harmful to this inmate?"[26]

42.    Segregation is not appropriate housing for those with serious mental illness, but

---

[23] Tr. 554, 557.
[24] Tr. 603.
[25] Tr. 605.
[26] Tr. 606.

there was no alternative appropriate housing.[27] Given the Decedent's mental status and the psychosocial stressors, he would have been an ideal candidate for a therapeutic unit. "Any relative isolation with somebody going through something like that, with nothing else to focus on but the disturbances in their thinking . . . there is no activity attempting to distract them from that."[28] For those who are most acutely ill, they need to be in a setting where they are seen daily, and that is difficult, if not impossible to do when held in segregation.[29] Dr. Dudley testified that weekly segregation rounds are not mental health treatment or therapeutic intervention. The rounds are more of "a monitoring check."[30] It is difficult for mental health staff to engage and work with individuals in segregation, so the services provided are minimal.[31]

43.    Dr. Dudley went on to testify about how the Defendants failed to provide the Decedent medical and mental health services. The Decedent was diagnosed with early onset bipolar disorder with psychotic features. For a developing adolescent, these mood swings are very disruptive. One may appear immature and childish because of developmental difficulties that occurred after adolescent years.[32] When he's depressed, he could be suicidal, hopeless, desperate. Dr. Dudley saw these behavior difficulties manifested in the jail records.[33] Dr. Dudley did not see indications that security staff recognized the Decedent's mental health needs.[34]

44.    The Decedent's records showed that on January 11, 2021, medical staff was unable to "give meds and do seg rounds check as normal" "due to security. On January 13, 2021, records at HCDC stated "no[t] able to see this individual today. He has been placed on lockdown because

---

[27] Tr. 607.
[28] Tr. 632.
[29] Tr. 608.
[30] Tr. 611-12.
[31] Tr. 613-14.
[32] Tr. 619.
[33] Tr. 620.
[34] Tr. 621.

of his recent aggressive behavior." Dr. Dudley stated that these notes indicate two things—one is an example of the fact that there is not more security staff available for medical and mental health staff to see an individual. The second note was also an example of a less than adequate working relationship between security and mental health staff to be on the same page recognizing that this is somebody who needs more mental health services and security observation as opposed to less.[35]

45.    On February 16, 2021, the Decedent's chart notes read, "individual was brought to medical by officers with acting out behavior. He was yelling and screaming 'I'm going to kill you.'" Nurse Davis asked Dr. Bell to order something to help calm the Decedent down. Dr. Bell gave a verbal order for medication.[36] Dr. Dudley testified, "I would expect him to be seen the next day and the next week."[37] On February 18, the Decedent's chart notes read, "not able to see this individual today. No security available."[38]

46.    Dr. Dudley testified that Hinds County did not provide the care and monitoring necessary to achieve basic levels of safety.[39]  "The fact that Mr. Mosley could not be seen as often as medical was attempting to see him interfered with efforts to provide treatment and efforts to adequately monitor him."[40] "I did not see day-to-day discussion and coordination between security and mental health staff in Mr. Mosley's case. The lack of coordination created a serious risk of harm in this case."[41]

---

[35] Tr. 625.
[36] Tr. 626.
[37] Tr. 627.
[38] Tr. 627.
[39] Tr. 631.
[40] Tr. 632.
[41] Tr. 633-34.

<u>**1983 CAUSES OF ACTION:**</u>
<u>**EIGHTH AND FOURTEENTH AMENDMENT VIOLATIONS:**</u>
<u>**PROTECTION FROM HARM AND DANGEROUS CONDITIONS OF**</u>
<u>**CONFINEMENT**</u>[42]

47.      Plaintiff incorporates all allegations set forth in Paragraphs 1 through 46

hereinabove.  Hinds County, acting by and through its elected and appointed officials, QCHC,

Brittany Pippins, Debra Bell, and Pamela Martin, acted with deliberate indifference in the

allegations listed above. The Plaintiff incorporates herein all reports attached as Exhibits A-E

discussing the conditions of the HCDC and that these conditions have caused and/or contributed

to the Decedent's death.

48.      As alleged in the DOJ Report, Hinds County maintained and operated the HCDC

in such a manner that the conditions of confinement resulted in a comprehensive and pervasive

pattern of serious deficiencies in providing for the basic human needs of the inmates detained in

the HCDC in every aspect.

49.      As alleged in the DOJ Report, the conditions of confinement also included a jail

that was deficient in so many respects that it was not suitable for human confinement. These

conditions resulted in the infliction of punishment on all of the inmates who were forced to live

there, including Decedent for the last days of his life. Such conditions violated Decedent's due

process rights, in violation of the Fourteenth Amendment to the United States Constitution.

50.      As shown in the DOJ Report, the conditions of confinement also included many

policies, practices, and customs that deprived most, if not all, inmates, including Decedent, of their

right to reasonable, adequate, and timely medical care, and their right not to be punished during

---

[42] Plaintiff provided QCHC and its employees a Notice of Claim pursuant to Mississippi Code Ann. § 15-1-36 (1972) more than 60 days prior to filing this Complaint.

their pretrial confinement. These included policies, customs and practices, whether written or unwritten, that were expressly announced, sanctioned and/or implemented by Lee Vance in his position as the final policymaker of the HCDC. They also included policies, practices and customs which, though possibly not formally adopted, had become so widespread, well-settled and deeply imbedded in their application, use, employment and acceptance in the jail to have become the policies of these Defendants.

51.     Defendant Hinds County, QCHC, Brittany Pippins, Debra Bell, Pamela Martin, and Doe Defendants 1-100 in their individual and official capacities, established customs, policies and procedures which directly and proximately caused the deprivation of the Decedent's constitutional rights as alleged herein.  Defendants were deliberately indifferent to the safety of the Decedent and other inmates housed at the HCDC.  As a result of these policies, the Defendants failed to protect the Decedent and created unconstitutional conditions of confinement.

52.     Such unwritten policies, customs and practices include, but are not limited to the following:

A.     inadequate and improper training, supervision and discipline of corrections officers;

B.     inadequate and improper procedures, policies and practices for investigating improper activities by officers either through offender complaints of misconduct or through internally-initiated complaints or investigations.

C.     inadequate or improper procedures, policies and practices for identifying and taking appropriate action against officers who are in need of re-training, corrective measure, reassignment, or other non-disciplinary actions, through a positive or early warning system designed to prevent the violation of inmates' rights.

D.     failure to properly classify inmates;

E.     the chronic understaffing at the jail and hiring jailers with little to no training or supervision.

F.    Failing to conduct safety checks in Booking or having officers assigned to Booking.

G.    Failure to provide constitutionally adequate mental health treatment for inmates, specifically Justin Mosley.

53.    Said conditions of confinement also included many policies, practices and customs that deprived most, if not all, inmates, including Decedent, of their right to reasonable, adequate and timely medical care. Some of the policies, customs and practices which constituted said elements included, but were not limited to:

A)    Regularly denying, delaying, or interfering with inmate requests for medical care during lockdown;

B)    Ignoring, delaying or failing to promptly comply with the treatment orders of the doctors;

C)    Refusing to accommodate the disabilities of inmates; and

D)    Not promptly providing reasonable medical care and treatment.

54.    The policies, practices and customs set forth in the preceding paragraph, as well as others which may come to light in the course of this litigation, resulted in numerous, repeated and pervasive deprivations of the Decedent's right to reasonable, adequate and timely medical care, under both the Eighth and Fourteenth Amendments.

55.    By exhibiting deliberate indifference to the substantial risk of harm the Decedent faced as a result of Hinds County's policies and practices set forth above, which resulted in failure to protect the Decedent from harm, ultimately resulting in his death, the Defendants, Hinds County, QCHC, Brittany Pippins, Debra Bell, Pamela Martin, and Doe Defendants 1-100, violated the Decedent's right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.

56.    Each of the foregoing policies, customs and practices were implemented, approved, ratified, known and/or constructively known by the officials of Hinds County.

57.    Each of the foregoing policies, customs and practices constituted elements of the conditions of Decedent's confinement and, both individually and in combination, were moving forces in the deprivation of Decedent's respective rights including his right to reasonable, adequate and timely medical care under the Eighth and Fourteenth Amendments.

58.    Plaintiff seeks recovery of all compensatory damages to which the Estate of Justin Mosley is entitled as a result of the conditions of Decedent's confinement, and the damages he suffered therefrom. Plaintiff further seeks recovery of punitive damages from Defendant QCHC, Brittany Pippins, Debra Bell, and Pamela Martin for its conduct in callous and reckless disregard for the rights, welfare and medical needs of Decedent.

### EPISODIC ACTS OR OMISSIONS

59.    Plaintiff incorporates all allegations set forth in Paragraphs 1 through 58 hereinabove.

60.     The Due Process Clause of the Eighth Amendment requires the Defendants to provide convicted inmates with basic human needs, including medical care and protection from harm, during their confinement. The Defendants and their employees had subjective knowledge of the substantial and serious threat that the Decedent might commit suicide, yet the Defendants nevertheless disregarded the risk of suicide by responding to it with deliberate indifference. The Defendants and their employees clearly breached this duty and as a result, Justin Mosley took his own life.

61.    As demonstrated in the DOJ Reports and other expert findings contained in Exhibits A-E, Hinds County maintained and operated a jail in such a manner as to cause the pervasive

deprivation of inmates' constitutional rights in every respect and at every level. The Decedent was forced to live in this jail and endure the action and inaction of its officials, as well as the jailers and jail staff acting in accordance with jail policies, customs and practices, under color of law, exhibiting callous and deliberate indifference, in depriving him of his rights guaranteed under the Constitution and laws of the United States.

62.    Hinds County, Doe Defendants 1-100, as well as jailers and jail staff acting pursuant to jail policy, practice and customs, created and required inmates to live in a jail that was deficient in so many respects that it was not suitable for human confinement. These actions resulted in the infliction of punishment on each of the inmates who were forced to live there, including the Decedent for the last days of his life.

63.    As shown hereinabove, Hinds County adopted, implemented and permitted many other policies, practices and customs that deprived most, if not all, inmates, including Decedent, of their right to reasonable, adequate and timely medical care. These included policies, customs and practices, whether written or unwritten, that were expressly announced, sanctioned and/or implemented by Vance as final policymaker of the HCDC. They also included policies, practices and customs which, though possibly not formally adopted, had become so widespread, well-settled and deeply imbedded in their application, use, employment and acceptance in the jail to have become the policies of these Defendants.

64.    Some of the policies, customs and practices of the HCDC included, but were not limited to:

A)    Regularly denying, delaying or interfering with inmate requests for medical care during lockdowns;

B)    Regularly denying or delaying all inmate requests and doctor's orders for inmate medical care through a specialist;

C)      Ignoring, delaying or failing to promptly comply with the treatment orders of the jail doctor and/or outside physicians;

D)      Refusing to accommodate the disabilities of inmates;

E)      Refusing to deliver an inmate's medication to that inmate; and

F)      Refusing to move seriously ill patients to a hospital or other location where they can receive appropriate care, instead leaving them in a jail cell and leaving no one but their cellmates to care for them.

65.      The policies, practices and customs set forth in the preceding paragraph, as well as others which may come to light in the course of this litigation, resulted in numerous, repeated, pervasive and persistent deprivations of inmates' rights to reasonable, adequate and timely medical care, under both the Eighth and Fourteenth Amendments, at the HCDC. Decedent suffered numerous deprivations of his right to reasonable, adequate and timely medical care due to the actions of these policymakers, their policies, the jailers, and the jail staff.

66.      QCHC employees acted with deliberate indifference and callous and reckless disregard for the rights, welfare and medical needs of and other constitutional rights of Decedent.

67.      Jailers and jail staff, including President Manuel and the Doe Defendants, acted, or failed to act, pursuant to the official policies, customs and practices of Vance and Hinds County, or at the direction of and with the approval of these officials, in depriving Decedent of his rights described herein. The policies, practices and customs were moving forces in the action and inaction for jailers, and jail staff, and these jailers and jail staff acted with deliberate indifference to the rights, welfare and medical needs and other constitutional rights of Decedent.

68.      Defendants' failure to properly oversee and manage the Decedent's obvious mental instability, i.e. condition directly caused his death. In doing so, Defendants violated clearly established constitutional rights, including but not limited to:

A.      Cruel and unusual punishment under the Eighth and Fourteenth Amendments;

22

B.    Decedent's right not to be deprived of liberty without due process of law;

C.    Decedent's right to be safe and protected from injury while in Defendants' custody; and

D.    Decedent's right to necessary medical treatment for his very serious medical/mental condition.

69.    By Defendants' failure to provide Decedent with the medically necessary care and/or medications required to properly manage his mental condition, Defendants' actions deprived Decedent of the rights secured for him by the United States Constitution under the Eighth and Fourteenth Amendments and federal law.

70.    The deprivation of the Decedent's rights by Defendants, as described herein, directly and proximately caused Decedent to suffer excruciating pain, extraordinary mental and emotional pain and anguish, and ultimately death.

71.    As a direct and foreseeable result of Defendants' actions, Plaintiff has suffered damage including, but not limited to, emotional distress, mental anguish, as well as pain and suffering.

72.    From Defendant Hinds County and QCHC, jointly and severally, Plaintiff seeks recovery of all compensatory damages to which the Estate of Justin Mosely is entitled.  Plaintiff further seeks recovery of punitive damages from QCHC, the individually named and Doe Defendants named herein (all in their individual capacities,) for the conduct in callous and reckless disregard for the rights, welfare and needs of the Decedent.

## DENIAL OF MEDICAL CARE

73.    Plaintiff incorporates all allegations set forth in Paragraphs 1 through 72 hereinabove.

74.    Defendants' failure to properly oversee and manage the Decedent's serious health condition directly caused his death. In doing so, Defendants violated clearly established constitutional rights, including but not limited to:

A)    Cruel and unusual punishment under the Eighth and Fourteenth Amendments;

B)    Decedent's right not to be deprived of liberty without due process of law;

C)    Decedent's right to be safe and protected from injury while in Defendants' custody; and

D)    Decedent's right to necessary medical treatment for his very serious medical condition.

75.    By their failure to provide the Decedent with the medically necessary medications And care required to sustain his life, Defendants' actions deprived him of the rights secured for him by the United States Constitution under the Eighth and Fourteenth Amendments and federal law.

76.    As a direct and foreseeable result of Defendants' actions, Plaintiff has suffered damage including, but not limited to, emotional distress, mental anguish, as well as pain and suffering.

## NEGLIGENCE/GROSS NEGLIGENCE

77.    Plaintiff incorporates all allegations set forth in Paragraphs 1 through 76 hereinabove.

78.    At all times relevant herein, Defendant QCHC and its employees had a duty to exercise ordinary care for the inmates at HCDC, including the Decedent. QCHC and its employees breached that duty, by failing to use the ordinary care that a reasonable person would use to avoid and prevent injury to others, i.e., in the case *sub judice*, to provide the appropriate, reasonable and

necessary medical care to accomplish same- the failure of which led directly to the incontrovertible permanent damage sustained by the decedent, Justin Mosley. This breach was so egregious as to amount to gross negligence.

79.    Justin Mosley's death was the reasonably foreseeable outcome of QCHC's employees' acts and omissions. These acts and/or omissions were substantial factors in causing his death, and the accompanying damages suffered by the Plaintiff.

## MEDICAL MALPRACTICE

80.    Plaintiff incorporates all allegations set forth in Paragraphs 1 through 79 hereinabove.

81.    Defendant QCHC, by and through the individually named and Doe Defendants, was negligent and/or grossly negligent in failing to properly care for, diagnose and treat Decedent.

82.    Brittany Pippins, Debra Bell, Pamela Martin, and the John and Jane Doe employees of QCHC were acting within the course and scope of their employment with QCHC. QCHC is liable for the acts and omissions of these individually named and Doe Defendants pursuant to the Mississippi Medical Malpractice Statute.

83.    QCHC, by and through their individually named and Doe Defendants, breached their duties to Decedent by failing to properly diagnose and treat him, despite his ever-worsening medical and mental symptoms, especially in light of his well-documented medical history, of which they were made aware. QCHC's employees failed to exercise the degree of care, skill and learning expected of reasonably prudent heath care providers in the State of Mississippi acting in the same or similar circumstances. These Defendants committed medical malpractice under the law by failing to diagnose and treat Decedent. This medical malpractice directly and proximately resulted in the harms and damages alleged herein.

## NEGLIGENT HIRING AND SUPERVISION

84.    Plaintiff incorporates all allegations set forth in Paragraphs 1 through 83 hereinabove.

85.    Plaintiff alleges Defendant QCHC and Doe Defendants 1-100 negligently hired, supervised, and retained its employees and agents, inter alia, by 1) failing to properly care for and ensure the Decedent's health, safety and well-being while incarcerated at HCDC; b) properly train, supervise, discipline, retain, hire and/or discharge its employees, agents, and/or representatives; and c) were otherwise negligent in their care and treatment of the Decedent, and as a direct and proximate result, the Plaintiff sustained the harms alleged herein.

## RESPONDEAT SUPERIOR

86.    Plaintiff incorporates all allegations set forth in Paragraphs 1 through 85 hereinabove.

87.    QCHC employees acted with negligence, gross negligence, and/or intentionally by allowing or failing to prevent Decedent's death. At all times relevant, each Defendant owed a duty to the Decedent to ensure his health, safety and well-being, and the Defendants breached this duty. The actions and inactions of QCHC, Brittany Pippins, Debra Bell, Pamela Martin, and/or Doe Defendants 1-100 led directly to the death of Justin Mosley. QCHC, as Brittany Pippins, Debra Bell, Pamela Martin, and Doe Defendants 1-100's employers, is liable for their actions which were undertaken during the course and scope of their employment.

88.    QCHC is also responsible for the actions and inactions alleged herein against them, Brittany Pippins, Debra Bell, Pamela Martin, and Doe Defendants 1-100, which caused the damages suffered by the Plaintiff. Further, such actions and/or inactions by Brittany Pippins, Debra

Bell, Pamela Martin, and the Doe Defendants were committed within the course and scope of their employment with QCHC.

## RATIFICATION

89.    Plaintiff incorporates all allegations set forth in Paragraphs 1 through 88 hereinabove.

90.    Hinds County, its policymakers and the Doe Defendants 1-100 were advised about the Hinds County incident involving the Decedent. Hinds County, by and through its policymakers, ignored evidence of widespread disregard of policies and procedures intended for the protection of inmates including the Decedent, and systemic deficiencies that violated the Decedent's constitutional rights. Based on information and belief, not one officer, supervisor, or any other person was retrained on policies intended for the protection of inmates. Instead, the policymakers approved the actions of the jailers and therefore ratified those actions.

91.    Through these acts and omissions of ratification, Hinds County's policymakers were deliberately indifferent to the Decedent's constitutional rights as set forth herein. A plaintiff can establish a municipal liability claim by showing that a final municipal policymaker approved an investigation that was "so inadequate as to constitute a ratification" of the misconduct. *Wright v. City of Canton*, 138 F. Supp.2d 955, 966 (N.D. Ohio 2001). "If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). An isolated decision by a municipal official that is not intended to control future decisions can nonetheless give rise to municipal liability. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986). Hinds County ratified its employees' conduct and is therefore liable for the Decedent's death.

## PUNITIVE DAMAGES

92.    The Plaintiff incorporates all allegations set forth in Paragraphs 1 through 91 hereinabove.

93.    Defendant QCHC, its employees, Brittany Pippins, Debra Bell, Pamela Martin, and Doe Defendants 1-100's employees, in their individual capacities, acted in complete disregard for the safety of the Decedent by acting in a negligent and/or grossly negligent manner as previously described herein. The actions of these Defendants warrant punitive damages.

94.    The Defendants' actions in their individual capacities exhibited gross negligence and direct disregard for the safety of the Decedent. Punitive damages should be awarded against the Defendants. Defendants' tortious actions caused the wrongful death of the Decedent, and therefore, Plaintiff's emotional distress and mental anguish.

## PRAYER FOR RELIEF

The Plaintiff, Chalonda Mosley, requests that upon a jury trial of this cause, the Court will award all relief due Plaintiff as set forth herein, including but not limited to the following:

A.    Order that the Defendants pay Plaintiff all damages allowed under Mississippi's Wrongful Death statute and caselaw;

B.    Order that the Defendants pay to Plaintiff a sum in punitive damages sufficient to deter these Defendants and others similarly situated from like conduct in the future;

C.    Payment of medical and burial expenses;

D.    Order the Defendants to pay Plaintiff's costs and expenses, including expert witness fees and reasonable attorney's fees, and prejudgment interest on all amounts found due and owing, including, but not limited to, those attorney's fees found properly awardable pursuant to 42 U.S.C. § 1988(b); and

E.      Grant such other general and special relief, of either an equitable or legal nature, to the Plaintiff as the Court deems just and proper.

RESPECTFULLY SUBMITTED, THIS the 9th day of March, 2023.


CHALONDA MOSLEY, PLAINTIFF


BY:     _/s/ Courtney D. Sanders_____
        COURTNEY D. SANDERS



OF COUNSEL:

CHARLES R. MULLINS (MB# 9821)
MERRIDA (BUDDY) COXWELL (MB# 7782)
COURTNEY D. SANDERS (MB# 106444)
COXWELL & ASSOCIATES, PLLC
Post Office Box 1337
Jackson, Mississippi  39215-1337
Telephone: (601) 948-1600
Facsimile: (601) 948-1600
chuckm@coxwelllaw.com
merridac@coxwelllaw.com
courtneys@coxwelllaw.com

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF CONSULTATION</u>

The undersigned attorney has reviewed the facts of this case and has consulted with at least one (1) expert, pursuant to the Federal Rules of Civil Procedure and the Federal Rules of Evidence, who is qualified to give expert testimony as to a standard of care or negligence and whom the undersigned attorney reasonably believes is knowledgeable in the relevant issues involved. The undersigned attorney has concluded on this basis for the commencement of such action.

BY:    */s/ Courtney D. Sanders*
COURTNEY D. SANDERS (MB# 106444)
COXWELL & ASSOCIATES, PLLC

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I, Courtney D. Sanders, have on this day filed the above and foregoing

**Plaintiff's First Amended Complaint** with the Clerk of the Court via the ECF system, which sent

notice of same to all counsel of record.

This the 9th day of March, 2023.


BY:    */s/ Courtney D. Sanders* _____
        COURTNEY D. SANDERS